IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES CALHOUN-EL, #160083      *

v.      *      Civil Action No. CCB-12-2119

RANDALL WATSON, et al.      *

     *
***

## MEMORANDUM

James Calhoun-El ("Calhoun-El") brings this action under 42 U.S.C. § 1983 against Defendants Warden Bobby Shearin, Director of Northern Region Jon P. Galley, Administrative Commissioner of Division of Correction Randall Watson, Chief of Security Keith Arnold, Lt. Paul Pennington, Lt. Dale Smith, Sgt. Derek Baer, CO II Christopher Preston, CO II Sharon Skelley, CO II Randolph Bennett and CO II Jeffrey Grabenstein (collectively, the "defendants"). ECF No. 1. The defendants, by their counsel, have moved to dismiss the complaint or, in the alternative, for summary judgment (ECF No. 17), and Calhoun-El has replied. ECF No 23; Exhibits 3 & 4.[1] After reviewing the record, the court finds a hearing is not required to resolve the issues. *See* Local Rule 105.6 (D. Md. 2011).[2] For the reasons set forth below, the defendants' motion, treated as one for summary judgment, will be granted.

## BACKGROUND

1. **Plaintiff's Assertions**

---

[1] Calhoun-El has submitted his declaration with the reply. Calhoun-El's submission of fellow inmate Jean Germain's declaration regarding Germain's purported placement in an isolation cell in 2011 is not relevant to the issues at bar.

[2] Calhoun-El's "Motion for Permissive Joinder" seeking to add fellow inmate Melvin Jones as a party to this proceeding (ECF No. 25) will be denied in a separate order. A self-represented plaintiff cannot maintain a class action. *See Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975).

Calhoun-El, an inmate at North Branch Correctional Institution ("NBCI"), is seeking compensatory and punitive damages in addition to declaratory relief. He states that on July 12, 2011, he received an infraction for weapon possession, a violation of institutional rule #115 for possessing a broken cable cord, and was later found not guilty of the infraction.

Calhoun-El states on July 21, 2011, he provided Sgt. Baer with documentation proving medical staff had ordered single inmate cell placement for him. Sgt. Baer informed Calhoun-El that he would be returned to a single cell after his release from segregation housing. Upon release from segregation, however, Calhoun-El was not placed in a single-inmate cell. When Calhoun-El objected and refused housing in a two-inmate cell, he was given a notice of infraction and returned to segregation housing. ECF No. 1, attachment at 6. Calhoun-El claims the medical order for single cell status, which was signed and dated by Dr. Ottey on July 22, 2011, was ignored at the adjustment hearing and he was found guilty of the infraction and received sixty days of disciplinary segregation. ECF No. 1, attachment at 6-7.

Next, Calhoun-El states that on July 29, 2011, he was ordered "cuff up" to accept a cell mate. He refused to comply[3] and was placed in a "contingency cell" by Officers Preston, Skelley, and Grabenstein. *See id.* at 7. Calhoun-El claims he stayed in the contingency cell for 14 days without a mattress, furniture or other items. *Id.* He alleges that he was denied medication, medical equipment, clean clothing and bedding, toilet paper, hygiene items, showers, nutritional and hot meals, ARP forms, library, mail, sick-call request forms, exercise, personal papers and books, and Ramadan fasting. Additionally, he complains that he was placed in a mental health

---

[3] Calhoun-El acknowledges that he refused to accept a double cell. ECF No. 23, Exhibit 4 at 4-5, ¶ 14. He states he refused the cell because there was no area for him to secure his personal property "to prevent theft, stopping a cellmate from reading my paperwork and to prevent contamination." *See id.* He asserts he was initially ordered single cell placement by Dr. Ottey because of degenerative disc disease. ECF No. 23, Exhibit 4 at 5, ¶ 15.

unit where the lights remained on 24 hours a day, the windows were sealed, and the cell was infested with bugs. Calhoun-El alleges that he suffered a high fever, nose bleeds, chest pain, weight loss, chronic back pain and loss of mobility in both legs as a result of these conditions. *Id.* at 7-8. He avers that because of these injuries, he needed a wheelchair on August 11, 2011, to attend court. *Id.* at 8.

Calhoun-El claims that he filed two Administrative Remedy Procedure requests (ARPs), NBCI #2461-11, and an unnumbered ARP filed on February 24, 2012,[4] in addition to filing appeals regarding those ARPs. He alleges Administrative Commissioner Watson ordered NBCI to discontinue the use of contingency cells.[5]

Calhoun-El states that on February 24, 2012, Lt. Pennington and Officer Bennett placed him in a contingency cell for eight days, without medication, medical equipment, hygiene items, clean clothing, toilet paper, legal paperwork, books, or showers.[6] *Id.* at 9. He claims he was placed in the cell after he filed "a grievance." ECF No. 23, Exhibit 4, at 5. Calhoun-El claims these conditions caused him chest pain, back injury, a severe nose bleed, worsening of his diabetic neuropathy in both feet, and increases in his AIC glucose level from 6 to 8, and that they necessitated increased diabetes medication and injections for back pain.[7] *Id.* at 9-10.

---

[4] Calhoun-El does not indicate the subject of the "unnumbered" ARP. There is no record before the court of an "unnumbered" ARP request that was considered by Defendants.

[5] Defendants dispute Calhoun-El's assertion that the Commissioner has discontinued use of these cells. ECF No. 17, memorandum at 10-11. Defendants assert Warden Shearin instructed NBCI staff to discontinue using the term "contingency cell" because there was "no clear definition for this term in this situation." *See infra* at ECF No. 17, Exhibit 17 at 7. Calhoun-El provides no evidence the Commissioner ordered NBCI to discontinue use of the cells. *See id.*

[6] Calhoun-El was placed on administrative segregation on February 24, 2012. ECF No. 17, Exhibit 20.

[7] Calhoun-El is a frequent pro se litigant in this court. *See Calhoun-El v. Watson*, RDB-12-2384 n. 22 (D. Md. 2013) (listing cases). A number of the claims he presents in this action are similar to or are derived from facts also alleged in *Calhoun-El v. Corizon Medical Services*, Civil Action RDB-12-2383 (D. Md. 2013) and *Calhoun-El v.*

## 2. Defendants' Response

Defendants have filed verified exhibits and declarations to support their dispositive motion. They are summarized below.

### A. Declarations

**Derek A. Baer** is a correctional officer at NBCI. Baer attests that on July 21, 2011, he inventoried Calhoun-El's property prior to Calhoun-El's move from disciplinary segregation to the general prison population. Baer states he "does not recall [Calhoun-El] showing me a single cell medical order." ECF No. 17, Exhibit 5. Baer attests Calhoun-El's property was "inventoried and documented according to the policy and procedures set by the Department of Public Safety and Correctional Services." *Id*.

**Jeffrey Grabenstein** is a correctional officer at NBCI. He states that on July 29, 2011, when he was assigned to "Housing Unit One Segregation Escort," Calhoun-El refused to have hand restraints applied or to exit cell 1-B-46 in order to have a cell partner placed in the cell. ECF No. 17, Exhibit 6. Calhoun-El was informed by Officer Christopher Preston that he would be receiving an adjustment ticket and escorted to a temporary housing cell. Calhoun-El was then handcuffed and escorted without incident to a temporary housing cell. Grabenstein states temporary housing cells are also referred to as "contingency cells." *See id*.[8]

**Sharon Skelley** is a correctional officer at NBCI. She states that on July 29, 2011, when she was assigned to "Housing Unit One Segregation Escort," Calhoun-El refused to have hand restraints applied or to exit his cell in order to have a cell mate placed in the cell. ECF No. 17, Exhibit 7. Calhoun-El was then informed by Officer Christopher Preston that he would be receiving an adjustment ticket and escorted to a temporary housing cell. Calhoun-El was then handcuffed and escorted to a temporary housing cell without incident. Skelley states temporary housing cells are also referred to as "contingency cells." *See id*.

**Christopher Preston** is a correctional officer at NBCI. He states that on July 29, 2011, when he was assigned to "Housing One B-Tier," Calhoun-El refused to have hand restraints applied or to exit his cell in order to have a cell mate placed in the cell. ECF No. 17, Exhibit 8. Calhoun-El was then informed by Officer

---

*Watson*. On May 28, 2013, Judge Bennett granted summary judgment in favor of defendants in *Calhoun-El v. Watson*. On June 26, 2013, Judge Bennett granted summary judgment in favor of defendants in *Calhoun-El v. Corizon Medical Services*. Calhoun-El has filed notices of appeal in both cases. *See United States v. Watson*, CA4 No. 13-6932 and *Calhoun-El v. Corizon Medical Services*, CA4 No. 13-7073.

[8] Calhoun-El does not raise any claims of excessive force.

4

Preston that he would be receiving an adjustment and escorted to a temporary housing cell. Calhoun-El was then handcuffed and escorted to a temporary housing cell without incident. Preston states temporary housing cells are also referred to as "contingency cells." *See id.*

**Jason Harbaugh** is Institutional Training Administrator for the Maryland Police and Correctional Training Commission. He has held this position since February of 2012. Prior to that time, he was assigned as the Housing Unit # 1 Manager at NBCI. He states he "never denied James Calhoun-El hygiene items, mattress and his meals that are within the parameters set by the Maryland Division of Correction, the North Branch Correctional Institution, and [m]edical authorities." ECF No. 17, Exhibit 11. He attests that "Calhoun-El, as with any other inmate confined to a segregation tier, was provided with opportunities to receive toilet paper, hygiene items, showers, three daily meals, recreation/exercise, personal property, access to medical and Ramadan fasting." *Id.* at ¶ 6. Further, Harbaugh states he never withheld mail belonging to Calhoun-El when it complied with departmental and institutional guidelines. *Id.* at ¶ 7. Harbaugh states Calhoun-El was provided ARP forms "just like every other inmate" housed at NBCI and "to the best of my knowledge and belief, since May 20, 2008 through October 15, 2012, James Calhoun-El has filed a total of one hundred and thirty-five (135) ARP's" through the NBCI Administrative Remedy Office. *Id.* at ¶ 8. Harbaugh states Housing One C-Tier at NBCI is a segregation tier, not a mental health tier. *See id.* at ¶ 9. Inmates who refuse housing are placed in a temporary housing cell. *See id.* at ¶ 10. Lastly, he states that although he was on vacation at the time in question, "it was HU # 1 practice to move inmates who refused to accept their housing assignments to a [t]emporary [h]ousing cell. They would remain there until they were willing to accept a safe suitable housing assignment." *Id.* at ¶ 11. He states Calhoun-El agreed on August 11, 2011 to move to another cell. *Id.*

**Dale Smith** is a correctional officer lieutenant at NBCI. He attests that he has "never denied James Calhoun-El hygiene items, mattress, and his meals that are within the parameters set by the Maryland Division of Correction, the North Branch Correctional Institution, and [m]edical authorities." ECF No. 17, Exhibit 12, ¶ 5. He attests "James Calhoun-El, as with any other inmate confined to a segregation tier, was provide with toilet paper, hygiene items, showers, three daily meals, recreation/exercise, personal property and access to medical." *Id.* at ¶ 6. Additionally, Smith states "I have never withheld mail belonging to James Calhoun-El, or any other inmate, when it was in compliance with existing departmental and institutional guidelines." *Id.* at ¶ 7. Smith further attests that Calhoun-El was provided ARP forms "just like every other inmate" housed at NBCI. *See id.* at ¶ 8. "In fact to the best of my knowledge and belief, since May 20, 2008[,] through October 15, 2012, James Calhoun has filed a total of one [h]undred and thirty-five (135) ARP's" through the NBCI Administrative Remedy Office. *Id.* Smith attests that to the best of his knowledge there is no bug

5

infestation in the temporary housing cell area and a pest control company is under contract to provide pest prevention at NBCI twice monthly. *See id.* at ¶ 9. Smith states inmates who refuse housing are placed in a temporary housing cell. *See id.* at ¶ 10. Lastly, Smith states he was Housing Unit One Manager on April 24, 2012, when Calhoun-El "refused to have hand restraints applied for Property Officer R. Bennett to place boxes in his cell . . . for him to pack his belongings and move to Housing Unit 2 due to his disciplinary segregation sentence expiring." *Id.* at ¶ 11. Officer Bennett informed Calhoun-El that he would receive an adjustment ticket for refusing housing. *See id.*

**Randolph C. Bennett** is a correctional officer at NBCI. He is the property officer for Housing Unit One. He attests that he has "never denied James Calhoun-El hygiene items, mattress, and his meals that are within the parameters set by the Maryland Division of Correction, the North Branch Correctional Institution, and medical authorities." ECF No. 17, Exhibit 21. Bennett states on April 24, 2012, Calhoun-El "refused to have his hand restraints applied in order to place boxes in his cell…for him to pack his belongings to move to Housing Unit 2 due to his disciplinary segregation sentence expiring." *Id.* at ¶ 6. Bennett then informed Calhoun-El that he would receive an adjustment ticket for refusing the housing assignment. *Id.*

**Bobby Shearin** ("Shearin") is Warden at NBCI. Shearin attests NBCI contains four separate housing units for inmates. "North Branch Housing Unit # 1, is primarily used as a [s]egregation [u]nit, housing both disciplinary and administrative [s]egregation inmates." ECF No. 17, Exhibit 27. Housing Unit # 2 normally is for inmates recently released segregation and serves as a "[s]tep down [u]nit" for inmates to adjust to life in the general prison population. *See id.* at ¶ 5. Housing Units # 3 and 4 are for the general prison population. *Id.*

B. **Exhibits**

   1. **Infractions**

      a. **July 13, 2011**

On July 13, 2011, Calhoun-El received an infraction for violation of institutional rules #100 (involvement in a disruptive activity), #105 (possession of a weapon or any article modified into a weapon), #406 (possession, passing, or receiving contraband), and #408 (misuse, alteration, tampering with, damaging, or destruction of any property, tool, or equipment including possession of any property in a hazardous condition). ECF No. 17, Exhibit 1. Specifically, two

6

pieces of wire, approximately 18 inches long, an electric adaptor with a tampered cover and eleven sheets of carbon paper were discovered in Calhoun-El's cell.[9] *See id.* at 4. At the adjustment hearing held on July 19, 2011, Calhoun-El pleaded guilty to violating rule #408. The hearing officer found him guilty of violating both rules #406 and #408. *See id.* at 1-6. [10] Calhoun-El received twenty days of cell restriction. Shearin affirmed the decision on appeal. ECF No. 17, Exhibit 2A.

### b. July 20, 2011

On July 20, 2011, Calhoun-El was given an infraction for violating institutional rules #400 (disobeying a direct order) and #401 (refusing housing). ECF No. 17, Exhibit No. 3. Calhoun-El indicated he refused the housing offered him because he had single-cell status. *See id.* at 4 and 10.[11] At the adjustment hearing held on July 28, 2011, Calhoun-El was found guilty of violating rules #400 and #401 and received 60 days of disciplinary segregation. *See id.* at 5; *see also* Exhibit 4. The hearing officer found:

> After reading the report of the staff (and hearing testimony) about this reported incident and weighing all of the information submitted (whether photos, matters of records, supporting documents) as provided if applicable to this reported incident; this individual testified he had single cell status. He presented paperwork to support same. Institutions rep [representative] indicated the document is typed, something the institution never does. Based on these facts,

---

[9] The Court takes notice that carbon paper is contraband at NBCI. *See Calhoun-El v. Watson*, Civil Action No. RDB-12-2384 (D. Md. 2013) (noting declaration of Keith Arnold, NBCI Chief of Security, states carbon paper is contraband).

[10] Thus, Calhoun-El's assertion that he was found not guilty of the infraction is only partially correct. ECF No. 1, attachment at 5-6; *see supra* p. 2. Calhoun-El pleaded guilty to violating Rule #408 (misuse, alteration, of property, including possession of property in a hazardous condition) and was found guilty of violating Rule #406 (possession of contraband). The administration chose not to pursue Rule #100 at the hearing. Calhoun-El was found not guilty of violating Rule #105 (possession of a weapon or any article modified into a weapon). ECF No. 17, Exhibit 1.

[11] Although neither party appears to have located and provided proper documentation of the single cell order at the hearing, defendants' records show that on July 23, 2011, Dr. Ottey ordered Calhoun-El's single cell status renewed. ECF No. 17, Exhibit 25, at 318. The duration of the order for single cell status is unstated. *See id.* The records do not show an earlier order.

Hearing Officer believes the document is not original. Hearing Officer finds this person guilty of 401 as he is not single cell status and should have gone into the cell.

ECF No. 17, Exhibit 3, at 4.

## 2. ARP Requests

On August 15, 2011, Calhoun-El filed ARP NBCI #2461-11, raising complaints about his fourteen-day placement in a temporary housing cell on July 29, 2011. ECF No. 17, Exhibit No. 17, at 1-5. He complained he was denied clean clothing, clean bedding, a mattress, showers, hot meals, medication and medical equipment, access to the ARP system, library access, incoming and outgoing mail, sick call request forms, exercise, personal papers and books, and Ramadan fasting. *See id*. at 1-2. He complained the cell was infested with bugs. *See id*. By memorandum dated August 31, 2011, Warden Shearin responded to Calhoun-El's concerns:

> Our investigation reveals that on July 29, 2011 you refused to comply with staff orders to have another inmate placed in your assigned segregation cell (double cell). You received an adjustment for interfering with duties of a staff, refusing a direct order by staff, and refusing housing in segregation. You were temporarily placed in HU 1-C-30 which has a toilet and sink. You refused a mattress when again offered by a Lieutenant on August 2, 2011. You refused to return to cell HU 1-B-46 (double cell) when offered by a Lieutenant and other segregation staff on August 2, 3, 7, [and] 9[,] 2011 and finally cooperated with HU 1 Unit Manager (Lieutenant) to move to a double cell on August 11, 2011. You were moved from your temporary assignment in HU 1 C-30 on August 11, 2011[,] to another segregation cell.
>
> The Record of Segregation Confinement sheet documents the above instances. The HU I Unit Manager (Lieutenant) and Sergeants made daily rounds, medical staff made rounds on each shift, and the Correctional Staff assigned to segregation made their usual 30 minute rounds as required by policy. You continued through this episode not to cooperate with HU 1 staff by refusing available services to include refusing a haircut on August 7, 2011. Medical has a documented history for your non-compliance with medication and a refusal to go to a scheduled sick call visit on August 13, 2011. The assigned nurses to HU 1 make rounds on every shift to dispense medication and provide inmates an opportunity to seek medical care in the segregation unit. Records further support

> your access to our ARP system as noted by the approximately 104 ARPs that you filed at NBCI between May 20, 2008[,] and August 15, 2011. The Record of Segregation Confinement indicates that numerous entries of "feed up" with ice on the days you were housed in HU 1 C-30. Additionally, when you were offered a bag meal, the nutritional value of the food items meets the necessary requirements for dietary purposes. There were no documented obstructions should you acknowledge your practice with Ramadan fasting as you were provided with the appropriate dietary items to suit your needs. HU 1 C-30 is a temporary cell that does contain a toilet and sink; however, you refused the mattress and other services offered to you by HU 1 staff. There were no instances of a bug infestation in your segregation cell. However, documentation does not clearly indicate access to out of cell activities that should have occurred at least 8 times and showers that should have been a minimum of 3 times during this period. It has been noted that you were uncooperative with staff and posed a potential safety and security risk towards staff and a disruption to HU 1 segregation operations.
>
> NBCI HU 1 staff and supervisors reasonably offered you the basic needs necessary and proper for your confinement in segregation. You continued to be uncooperative and unwilling to accept the services offered and a double cell housing assignment. NBCI HU I staff should not have used the term "contingency cell" as there is no clear definition for this term for this situation. We have instructed our staff to discontinue use of this term. However, it is noteworthy that temporary assignment to HU 1 C-30 did provide you with a toilet and sink and offering you a mattress addresses reasonable accommodations within NBCI segregation unit.
>
> As a remedy, for not properly documenting out of cell activities, meals, showers, and inappropriately identifying your temporary housing as a "contingency cell", [sic] seventy-five dollars has been placed in your commissary account.

ECF No. 17, Exhibit 17, at 6-7; *see also* Exhibit 17, at 9-10 (ARP investigation report).

Calhoun-El appealed the ARP on September 27, 2011. The appeal was dismissed on December 16, 2011. ECF No. 17, Exhibit 18, at 1.

On March 14, 2012, Calhoun-El filed ARP NBCI # 0818-12 complaining that medical staff had created a fraudulent document on February 21, 2012, in order to remove him from single-cell placement. ECF No. 17, Exhibit 19, at 1-2. Further, Calhoun-El alleged that on

9

March 10, 2012, Dr. Ottey had informed him that his single cell status would not expire until September 20, 2012. *See id.* at 2. Calhoun-El blamed his subsequent placement in the temporary cell on the allegedly fraudulent documentation. *See id*. As relief, he asked for transfer to a geriatric housing unit at Jessup Correctional Institution. *See id*.

Investigation of the ARP revealed no evidence to substantiate Calhoun-El's claim that he had been issued single cell status to remain in effect until September 20, 2012, or grounds to find Dr. Joubert's order discontinuing single cell placement fraudulent. *See id*. at 3. On April 11, 2012, the ARP was dismissed for lack of merit. *See id*. at 1 & 5-8; Exhibit 25, at 243.[12]

### 3. Medical Records

Calhoun-El suffers diabetes with chronic neuropathy,[13] hypertension and Hepatitis C. ECF No. 17, Exhibit 25 at 317. A July 15, 2011, note to Calhoun-El's medical chart indicates he had no medical problems preventing his transfer to the segregation unit. *See id*. at 320. On July 22, 2011, Calhoun-El was seen by medical staff for complaints of chronic lower back pain. He reported he was unable tolerate his medication. *See id*. at 317-19.

On August 11, 2011, while Calhoun-El was housed in the temporary cell, he received an unscheduled nurse visit for a blood pressure check. *See id*. at 316. On August 11, 2011, a chart update was conducted by teleconference to discuss antiviral therapy with Dr. Rufeal, a liver specialist, and to discuss plaintiff's medical appointment "no shows," medical trips, and plaintiff's continued back pain and other ongoing complications. *See id*. at 315. Calhoun-El went to a court appearance on August 11, 2011. On August 18, 2011, Calhoun-El refused to attend an

---

[12] On February 21, 2012, Dr. Joubert issued an order discontinuing Calhoun-El's single cell status. It states there was no medical indication for a single cell. ECF No. 17, Exhibit 19, at 8; Exhibit 25, at 243.

[13] Diabetic neuropathy is a complication of diabetes which causes nerve damage. *See* www.medicinenet.com/diabetic.

adjustment hearing. He claimed he was unable to walk to the hearing and needed a wheelchair. ECF No. 17, Exhibit No. 14, at 3. Correctional officers contacted the medical department, and were advised that Calhoun-El had no medical need for a wheelchair. *See id*.

On August 12, 2011, Calhoun-El filed a sick-call request/encounter form complaining that he was forced to lie on a concrete floor with no mattress for 14 days. He claimed he was unable to walk as a result. ECF No. 27, Exhibit 25, at 111. Additionally, he complained he was without medication for over fourteen days, resulting in chest pain, headaches, and sickness. *See id*. A nurse sick-call was scheduled for August 13, 2011, but Calhoun-El refused to go to the appointment. *See id*. at 314.

On January 20, 2012, Calhoun-El submitted a sick-call request complaining of worsening diabetic neuropathy because his medical shoes had been confiscated by staff. ECF No. 17, Exhibit 25, at 86. On January 28, 2012, he filed another sick-call slip complaining his diabetic neuropathy had worsened because his medical shoes were causing him back spasms. *Id.* at 85. On February 17, 2012, upon his return to NBCI from temporary housing at Jessup Correctional Institution (JCI), Calhoun-El complained that he was without his diabetes, blood pressure and heart medications while housed at JCI on February 15, 16, and 17, 2012. *See id*. at 80; Exhibit 26, at 4. Defendants observe that Calhoun-El's medical history demonstrates repeated refusals of medications, medical appointments and lab tests. ECF No. 17, Exhibit 25, at 2-31.

## STANDARD OF REVIEW

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." This does not mean

that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). A court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002). A court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24) (1986)).

## DISCUSSION

To state a cause of action pursuant to 42 U.S.C. § 1983, there must be an allegation of a violation of a federal constitutional right or law. *See Baker v. McCollan*, 443 U.S. 137, 139-40 (1979). In his complaint, Calhoun-El has failed to allege deprivation of any rights, either constitutional or statutory, which would entitle him to relief under § 1983. Mindful that Calhoun-El is a self-represented litigant, however, this court has accorded his pleadings generous

construction. *See e.g. Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Erikson v. Pardus*, 551 U.S. 89, 94 (2007).[14]

### 1. Conditions of Confinement

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *See Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id*. "In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted) "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Wilson*, 501 U.S. at 298-300); *see also Farmer v. Brennan*, 511 U.S. 825, 838-39 (1994).

---

[14] Calhoun-El's pleadings are frequently rambling, repetitive, and disjointed, making it difficult to discern his arguments.

Calhoun-El's allegations concerning his two placements in a temporary cell, one of fourteen days beginning on July 29, 2011, and the other of eight days beginning on February 24, 2012, fail to show conditions so extreme as to constitute a deprivation of constitutional magnitude.[15] First, Calhoun-El's placements were brief and limited in duration. The defendants' records show Calhoun-El's temporary cell was equipped with a toilet and running water.[16] He was provided ice in his cell. The defendants also claim that Calhoun-El was provided with opportunities to receive toilet paper, hygiene items, showers, three daily meals, recreation, exercise, personal property, access to medical care and fasting during Ramadan.

The defendants assert Calhoun-El received medical visits and treatment. Notably, the defendants' records indicate Calhoun-El refused to have a mattress in his cell. In his reply, Calhoun-El denies receiving medication and a mattress. ECF No. 23, Exhibit 4. Calhoun-El's medical records, however, show a prior history of raising complaints similar to those he specifically attributed to his two stays in the temporary cell. Indeed, there are similar complaints throughout the medical record. ECF No. 17, Exhibit No. 25. On three medical request slips dated May 31, June 2, and June 10, 2012, all times when Calhoun-El was not housed in a temporary cell, he complained of nose bleeds which he attributed to heat in his cell. *See id*. at 66-68; Exhibit Nos. 17-19.

Calhoun-El's ARP complaint concerning the conditions during his fourteen-day cell assignment was investigated and resulted in a finding that his out-of-cell activities, meals, and showers had been improperly documented and the cell inappropriately identified as a

---

[15] The records show that Calhoun-El was placed in the temporary cell due to his refusal to admit another inmate to his segregation cell. However, double-celling inmates does not constitute cruel and unusual punishment proscribed by the Eighth Amendment. *See Rhodes v. Chapman*, 452 U.S 337, 347-48 (1981).

[16] In his initial complaint and an affidavit, Calhoun-El states that there was no shower or toilet paper in his temporary cell. *See* ECF No. 1 at 11, ECF No. 23, Exhibit 10, at ¶ 8.

"contingency cell."[17] The ARP response provided Calhoun-El with seventy-five dollars in his commissary account as compensation for the error. Failure to document, however, does not equate with a violation of constitutional proportion where actual physical injury is not apparent.

### 2. Medical Claim

To state a constitutional claim for lack of proper medical care, Calhoun-El must show the actions or inactions of prison authorities demonstrate "deliberate indifference" to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Additionally, there must be some personal involvement on the part of prison officials. *See Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985).

None of the defendants is a medical practitioner. None of the defendants is alleged to have any direct personal involvement in Calhoun-El's medical care. Moreover, as non-medical officials, they are entitled to rely on the medical judgment and expertise of prison physicians and medical staff concerning the course of treatment necessary for inmates. *See Shakka*, 71 F.3d at 167; *Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990) (stating that supervisory prison officials are entitled to rely on professional judgment of trained medical personnel but may be found to have been deliberately indifferent by intentionally interfering with an inmate's medical treatment ordered by such personnel). Calhoun-El does not allege the defendants interfered with his medical care. Accordingly, defendants are entitled to summary judgment as to this claim.

### 3. Mail and Access to the Courts

Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 821 (1977). However,

---

[17] As noted previously, Calhoun-El's ARP regarding the eight-day placement complained about "fraudulent" documents created to remove him from single cell assignment.

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U.S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 356). "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Id.* at 343. Calhoun-El alleges no actual injury as a result of the purported denial of access to the prison library, to incoming or outgoing mail, personal papers and books.[18] Defendants are entitled to summary judgment as to this claim.

### 4. Infractions

Calhoun-El does not allege, nor does the record suggest, that the disciplinary process violated his right to due process. *See Wolff v. McDonnell*, 418 U.S. 539, 564-65 (1974) (inmates entitled to certain due process where there is possible loss of good conduct credits);

---

[18] Calhoun-El's claims of actual injury caused by alleged confiscations, destruction, and loss of his legal papers and mail were examined in *Calhoun-El v. Watson*, RDB-12-2384. As noted previously, summary judgment in that case was entered in favor of the defendants.

16

*Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454 (1985) (disciplinary hearing decision must be based on "some evidence").

Calhoun-El claims he was issued an infraction on February 24, 2012, and placed in a temporary cell in retaliation for filing a "grievance." Retaliation against an inmate for the exercise of a constitutional right states a claim, *see American Civ. Liberties Union v. Wicomico County*, 999 F.2d 780, 785-86 (4th Cir. 1993). The plaintiff "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). In order to state a claim for retaliation, Calhoun-El must demonstrate 1) the invocation of a constitutional right; 2) the intent to retaliate against him for his exercise of that right; 3) a retaliatory adverse act; and 4) causation, i.e., but for the retaliatory motive, the complained-of incident would not have occurred. *See Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997). As there is no constitutional entitlement to participate in a prison grievance process, a constitutional claim of retaliation is not supported. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir.1994). Furthermore, Calhoun-El offers no specific evidence to support his claim that filing this unidentified grievance was the cause of his placement on administrative segregation. Indeed the record indicates he has been able to make use of the prison grievance system on multiple occasions without adverse consequence. Accordingly, the defendants will be granted summary judgment as to this claim.

**5. ARP Process**

Insofar as Calhoun-El intends to present a claim regarding the ARP process, there is no

constitutional right to the establishment of an administrative remedy or other grievance process or to participate in one voluntarily established by the state. *See Adams*, 40 F.3d at 75. Therefore no constitutional right is implicated by alleged errors in such a process. Further, the defendants' declarations refute Calhoun-El's assertions that he was denied ARP forms while in temporary housing.

### 6. Ramadan Fasting

Apart from his own statement that he was denied Ramadan fasting, Calhoun-El's assertion is wholly unsubstantiated.[19] Lieutenant Harbaugh's declaration states Calhoun-El was not denied Ramadan fasting. Calhoun-El fails to show there is a genuine issue of material fact, and thus the defendants will be granted summary judgment as to this claim.[20]

## CONCLUSION

For the reasons stated above, the court will grant the defendants' motion for summary judgment. A separate order follows.

July 26, 2013  /s/
Date  Catherine C. Blake
 United States District Judge

---

[19] In his complaint, Calhoun-El states that he was denied Ramadan fasting, but he does not mention it in his affidavit. *See* ECF No. 1, attachment at 8; *see also* ECF No. 23, Exhibit 4.

[20] In light of these conclusions, the court need not reach the defendants' qualified immunity defense.